410 So.2d 842 (1982)
STANDARD MACHINE & EQUIPMENT COMPANY, Plaintiff-Appellant,
v.
SOUTHERN PACIFIC TRANSPORTATION COMPANY, Defendant-Appellee.
No. 8600.
Court of Appeal of Louisiana, Third Circuit.
February 3, 1982.
Rehearings Denied March 23, 1982.
*843 Hunt, Godwin, Painter & Roddy, John S. Hood and E. C. Hunt, Alexandria, for plaintiff-appellant.
Scofield & Associates, Robert L. Hackett, Raggio, Cappel, Chozen & Berniard, Thomas L. Raggio, Lake Charles, for defendant-appellee.
Before DOMENGEAUX, DOUCET and LABORDE, JJ.
LABORDE, Judge.
Plaintiff, Standard Machine & Equipment Company, (Standard) filed this property damage suit seeking an award for damage to and resulting loss of use of its 125 ton capacity motor crane which was struck by four railroad cars at the Olin Chemical Plant, Westlake, Louisiana. Made defendants were Olin Corporation (Olin) and Southern Pacific Transportation Company (Southern Pacific). Defendants brought third party actions against each other and Olin additionally filed a third party claim against Standard seeking expenses and attorney's fees.
At the conclusion of Standard's case-in-chief, the trial court granted Olin's motion for dismissal but limited it to the main demand. A similar motion urged by Southern Pacific was denied. No third party claims were dismissed.
The trial court awarded Standard $2,256.02 on its main demand against Southern Pacific. Southern Pacific's third party claim against Olin was denied. Olin's third party claim against Standard for expenses and attorney's fees was granted and Olin was awarded $5,000.
Standard appealed devolutively from the damage award against Southern Pacific and suspensively from the expenses and attorney's fee award against it. Both Southern Pacific and Olin answered the appeal.
Questioned on appeal are the court's findings regarding: the granting of Olin's Motion for Dismissal; the negligence of Southern Pacific; the contributory negligence of Standard; quantum; indemnity or other contractual agreements existing between Olin and Standard and between the predecessors of Olin and Southern Pacific; the calling of employees of the different parties under cross examination; and the proffer made by Southern Pacific and considered by the court in reaching its conclusions.
We reverse and as permitted by LSA-C. C.P. art. 2164, remand.
The trial court in its well-written reasons for judgment adequately outlined the salient facts of the instant matter which we adopt as follows:
"Plaintiff brings this action for property damage to, and resulting loss of use, of its 125 ton capacity Link-Belt Motor Crane which it sustained when struck by an untended hopper railroad car at the Olin chemical plant at Westlake, Louisiana. Made defendants are Olin Corporation and Southern Pacific Transportation Company. The defendants then bring third party action against each other and Olin third parties original plaintiff for its expenses and attorney fees.

*844 Plaintiff, whose business is demolishing industrial facilities, entered into a written contract with Olin to demolish a soda ash unit on the south side of its plant site.
Olin makes considerable use of railroad transportation and has its own trackage within its facilities. One track, hereinafter referred to as Track 4, forms an oval near the outer sides of the plant property and has various sidetracks in different areas. Olin uses its own engine to position cars for its operational uses but Southern Pacific, whose tracks come to the site and join those of Olin, delivers railroad cars to the site and upon receiving a `list-out' from Olin gathers the designated cars from their location and takes them away from the plant site for shipment.
Near the south side of the site, Track 4 runs approximately east and west and there are three side tracks off the south side of Track 4, which join Track 4 at each of their ends. All four of these tracks run through the soda ash unit which was to be demolished and was approximately equidistant from the east and west end of the side tracks. For purposes of identification the side tracks are referred to numerically by numbers 3, 2 and 1, with Track 1 being the southern most one. The contract between Olin and plaintiff provided that plaintiff may use Tracks 3, 2 and 1 for loading for shipment the salvage and debris from the unit.
On October 12, 1977, plaintiff was using its 125 ton capacity Link-Belt Motor Crane in its demolishing work. The crane was equipped with 200 feet of boom and a sixty foot jib boom entending from its upper end. The crane was positioned between Tracks 1 and 2, with its outriggers extended and the front at an angle near to or extending partially over Track 1. The front end of the crane, or at least the truck or `carrier' upon which it was mounted, was facing approximately west-southwest. At the end of the day work shift the load line had been lowered from the boom, fastened to a piece of the plant and the slack pulled out, making it taunt for stability against wind.
Five covered hopper railroad cars were parked on Track 1, west of the crane, with the one nearest the crane a distance of 200 feet or more. It is unknown who placed the cars there or when they were put there, although there is some indication they had been there at least since the previous day. Olin had given Southern Pacific a `list-out' the day before for the car located fourth from the west end. The Southern Pacific engine, with some cars to make up a train, came around Track 4 from the east, stopped, disconnected from its cars, backed onto Track 1 and connected to the first car. The train crew disconnected the fifth car, leaving it in place, pulled the four cars out onto Track 4, backed up and connected the fourth car to its train. The third car was then disconnected from the fourth car, the engine pulled the three cars forward, backed onto Track 1 and car three was connected to car five, the car which had been left in its original position. The couplings of cars three and five did not connect when the engine backed car three against car five and it was only after the engine pushed car three back against car five the third time that the connection was made. In this process car five was pushed east a few feet. The brakeman who saw to this connection, Mr. Ray Duhon, then signaled the engine to back up (to the east, toward the crane) as he walked toward the engine, to disconnect it from car one. The cars are each about 50 feet long, and Mr. Duhon was approximately 150 feet east of the engine when he ordered it to back toward him. The engine then departed Track 1 for Track 4, connected to its `train' and proceeded around the west end of the plant site to perform work on the north side of the plant.
According to testimony of all the train crew and from some of the photographs in evidence, a portion of Track 1 slopes slightly down, from west to east.
Immediately after the crew and train departed the area and unknown to the train crew, the four hopper cars rolled down the grade at a slow speed and the *845 left corner of car five collided with the left front of the crane `carrier'."
We begin with the issue of whether the trial court properly granted Olin's motion, dismissing Standard's suit against it. The unusual events preceding Olin's dismissal are very important to the outcome of this issue on appeal and for that reason, we feel it important to detail them.
In its petition against Olin, Standard alleged that the accident was due in part to Olin's negligence which consisted of:
"(a) Assigning and designating an area for the performance of petitioner's contractual work when such area was known by defendant to be extremely hazardous and unsafe;
(b) Allowing petitioner to position its equipment in an area known by defendant to be dangerous and unsafe;
(c) Failing to contact SOUTHERN PACIFIC TRANSPORTATION COMPANY and inform them of the nature of the work being undertaken by petitioner and the position of petitioner's equipment;
(d) Failing to make the railroad tracks assigned to petitioner under the contract safe for the intended use and purpose;
(e) Failing to adequately perform safety inspections of the work being done by petitioner under the contract between petitioner and OLIN CORPORATION for Soda Ash Demolition;
(f) Other acts of negligence to be proven at trial."
Near the beginning of trial, Standard attempted to call employees of Southern Pacific under cross-examination. The trial judge ruled against this and Standard proceeded to put on its case by calling the employees under direct examination. The trial continued under this ruling and plaintiff rested its case without calling any of Olin's employees to testify. Olin moved for dismissal pursuant to LSA-C.C.P. art. 1810(B) and the trial court, over objections, granted the motion but limited it to a dismissal of the main demand only. The trial continued with Southern Pacific putting on its case. As part of its case, Southern Pacific called two of Olin's employees; safety supervisor, Huey McClure, and construction superintendent Dale Roger Bonin. Later during the trial, the trial court realized its error in not allowing the parties to call employees of the other parties under cross-examination. In an effort to remedy this error, the trial judge allowed the parties to re-call witnesses or re-classify testimony already received.
Plaintiff was also allowed to re-open its case-in-chief. Instead of calling or re-calling witnesses, plaintiff, in addition to converting some of the testimony already received, converted the testimony of the two Olin employees called by Southern Pacific into testimony under cross-examination and then included it as part of its case-in-chief. Due to its changed ruling and the effect thereof, the trial court required all previously granted motions to be re-urged. Olin again moved to have Standard's case against it dismissed and the trial court again granted this motion. With these facts in mind, we must determine whether the trial court erred in granting Olin's motion for dismissal.
Louisiana Code of Civil Procedure Article 1810(B) provides:
"B. In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence."
The proper standard for granting a judgment of dismissal under LSA-C.C.P. art. 1810(B) was announced in Sevin v. Shape Spa For Health & Beauty Inc., 384 So.2d 1011 (La.App. 4th Cir. 1980). In the Sevin case, the court stated that in a non-jury case, the trial judge in considering a motion under Article 1810(B), must weigh and evaluate *846 all of the evidence presented up to that point in the trial and must grant a dismissal if plaintiff has not established proof by a preponderance of the evidence.
Applying this standard to our case, we hold that the trial judge erred in granting Olin's motion for dismissal.
When Olin's motion was re-urged the second time, the evidence at that point included the testimony of some of Standard's employees, the testimony of some of Olin's employees and the contract entered between Olin and Standard. A review of this evidence convinces us that Standard sustained its proper burden of proof.
The evidence showed that Olin maintained a stringent safety program at its plant and required of its contractors that they participate in this safety program by attending safety meetings. Adherence to Olin's safety program was made a part of the contract between Olin and its contractors. The testimony of Olin employees, Huey McClure and Dale Roger Bonin, vividly illustrates the obligations of Olin in this regard. Mr. McClure, safety supervisor of the area where the accident occurred, testified that his duties included monitoring safety within Olin's plant. In carrying out this duty, walk-through inspections were conducted periodically to see if the contractors were abiding by Olin's safety rules and regulations. Mr. McClure, when questioned about what he would do if he saw a situation involving a potential danger of great property damage, replied that he would contact the contractor and assist him in correcting it.
Mr. McClure testified that he had never been informed that the crane was blocking the railroad track but that had he known he would have advised Southern Pacific and he probably would have used cross-ties or some other device to block the track ahead of the crane.
Mr. McClure further testified that he was aware of the incline and knew that it was a possibility that cars would roll down the incline.
Mr. Bonin, who in the Olin chain of command was responsible for monitoring and inspecting the jobs under Mr. McClure's supervision, also testified. Mr. Bonin stated that he could see that the crane was blocking or fouling Track 1; that he had no authority to permit the blocking; that he did not know whether the crane blockage had been cleared with either Olin or Southern Pacific; and that he assumed, without checking, that it had been cleared with Olin.
Mr. Bonin also testified that in order for Standard to fulfill its contract, the crane had to be situated precisely where it was.
Earl Millsaps, general superintendent for Standard, testified that Standard had permission from Mr. Bonin to block Track 1. In this regard, Mr. Bonin testified that he did not remember giving Mr. Millsaps permission to block Track 1 but added that neither could he deny that he had. Mr. Bonin also admitted that he had never known of Standard blocking a track without obtaining permission.
The extent of Olin's duty is best illustrated by the last question posed to Mr. Bonin and his answer to that question:
"Q If you had discovered a defect or felt that there was an unsafe situation regarding the position of the crane, do you feel it was a part of your duty as a construction superintendent and area superintendent to have pointed those out to Standard Machine?
A Definitely."
Based on the above, we hold that the preponderance of the evidence presented by plaintiff established breach of a duty on the part of Olin.
In order to do justice to the parties, we decline the invitation to decide this case finally on the incomplete record before us. We fear that plaintiff was never fully able to recoup its loss of procedural options because of it being denied initially the right of cross-examination. Also, due to the procedural rulings noted above, the record in its present state suggests that Olin, who never was required to call any witnesses, may have claims which were not presented to the trial court. As permitted by LSA-C.C.P. *847 art. 2164, we order that the case be remanded. Further, we elect to remand in toto due to our belief that the whole complexion of the case may be changed by the additional evidence.
For the above reasons, the judgment of the trial court is set aside and the case is remanded for trial of all claims and issues. All costs to await final disposition.
REVERSED AND REMANDED.